IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

VENETTA COX, o/b/o J.J.R.[1],      *
                                    *
     Plaintiff,                     *
                                    *
vs.                                 *   CIVIL ACTION 10-00554-B
                                    *
MICHAEL J. ASTRUE,                  *
Commissioner of Social Security,    *
                                    *
     Defendant.                     *

ORDER

Plaintiff Venetta Cox ("Plaintiff") brings this action on behalf of her minor child, J.J.R., seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for child supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. ("SSI).  On June 22, 2011, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 17). Thus, this case was referred to the undersigned to conduct all proceedings through entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 19).  Oral argument was waived.  Upon careful consideration of the

_____

[1] Pursuant to the E-Government Act of 2002, as amended on August 2, 2002, the Court has redacted the minor child's name throughout this opinion and refers to him only by his initials, "J.R."

administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

## I.   <u>Procedural History</u>

Plaintiff protectively filed an application for supplemental security income benefits on behalf of her son J.J.R. (hereinafter "J.R.") on November 5, 2007[2]. Plaintiff alleges that J.R. has been disabled since June 1, 2004 due to attention deficit hyperactivity disorder ("ADHD"). (Tr. 85, 102, 123-25, 136, 182). Plaintiff's application was denied at the initial stage on February 11, 2008, and she filed a timely Request for Hearing before an Administrative Law Judge ("ALJ"). (Tr. 81-88). On August 19, 2009, Administrative Law Judge Alan E. Michel held an administrative hearing, which was attended by Plaintiff, her son J.R., and her attorney. (Tr. 30-52). On September 16, 2009, the ALJ issued an unfavorable decision finding that J.R. is not disabled. (<u>Id.</u> at 9-24). Plaintiff's request for review was denied by the Appeals Council ("AC") on August 10, 2010. (<u>Id.</u> at 1-5, 6-8).

---

[2] Plaintiff previously filed an application for benefits asserting similar claims, which was denied by an Administrative Law Judge on October 4, 2007. (Tr. 53-73).

The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 1383(c)(3).

## II.   Issues on Appeal

A.   Whether the ALJ erred by failing to discuss the weight if any, accorded to the opinions of two of J.R.'s teachers.

## III.   Factual Background

J.R. was born on November 3, 1997. He was 10 years old and in the fourth grade when his application was submitted.   When the administrative hearing was conducted on August 19, 2009, J.R. was 11 years old and in the fifth grade.   (Tr. 39, 79, 123, 136).   At the hearing, J.R.'s mother testified that he repeated first grade and that for the past two years, he has been in special education classes. (Tr. 40-41). According to Plaintiff, J.R. use to make "Ds" and "Es", but he began receiving assistance through the Individualized Education Program ("IEP"), and is currently earning "Bs" and "Cs". (Id. at 42). Plaintiff also reported that J.R. gets into trouble at school for not sitting still, not paying attention, and talking. (Id. at 41, 46).

Plaintiff testified that J.R. and his younger sister get along but that they fight and argue "like siblings do." (Id. at 42). She also testified that J.R. likes to watch television and play video games, and that J.R. can dress and bathe himself,

3

although, she generally has to go behind him because he does not do a "good job." (Id. at 43, 44). Plaintiff also reported that J.R. gets mad and frustrated when she directs him to do chores such as taking out the trash. (Id.)

Plaintiff testified that J.R. sees a therapist and nurse practitioner at the LeMoyne Center monthly and is treated by a neurologist for seizures, which have been controlled by medication. (Id. at 47-49). She also testified that J.R. takes medications[3] on a regular basis, and that it helps him to get his work done, and also helps with his eating and sleeping. (Id. at 42, 43, 48-49).

## IV. **Analysis**

### A. **Standard Of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[4]  A court may not decide the facts

---

[3]   J.R.'s medications referenced in the record include Daytrana patch 15 mg, Depakote 125 mg, Clonidine HCL 0.1 mg, and Zoloft 25 mg. (Id. at 194, 240-46).

[4] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. _Sewell v. Bowen_, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. _Brown v. Sullivan_, 921 F.2d 1233, 1235 (11th Cir. 1991); _Bloodsworth v. Heckler_, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. _Chester v. Bowen_, 792 F. 2d 129, 131 (11th Cir. 1986); _Short v. Apfel_, 1999 U.S. Dist. LEXIS 10163 (S.D. Ala. 1999).

**B. Childhood Disability Law**

The Personal Responsibility and Work Opportunity Act of 1996, which amended the statutory standard for children seeking supplemental security income benefits based on disability, became effective on August 22, 1996. See Pub. L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. § 1382c). The definition of "disabled" for children is:

> An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or

5

> mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

See 42 U.S.C. § 1382c(a)(3)(C)(I), 20 C.F.R. § 416.906.[5]   The regulations provide a three-step sequential evaluation process for determining childhood disability claims.   20 C.F.R. § 416.924(a).

At step one, a child's age/work activity, if any, are identified to determine if he has engaged in substantial gainful activity. At step two, the child's physical/mental impairments are examined to see if he has an impairment or combination of impairments that are severe. Under the regulations, a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). To the extent the child is determined to have a severe impairment, at step three, the Commissioner must then determine whether the impairment or combination of impairments meet or is medically or functionally equal to an impairment listed in Appendix 1 of 20

---

[5] On September 11, 2000, the Commissioner published Final Rules for determining disability for a child under the age of 18. See 65 Fed. Reg. 54,747, corrected by 65 Fed. Reg. 80,307. These rules became effective on January 2, 2001 and apply to Plaintiff's claim. See 65 Fed. Reg. at 54,751.

C.F.R. part 404, subpart P, and otherwise satisfies the duration requirement. 20 CFR § 416.924.

If the ALJ finds that the impairments are severe, but do not meet the listing requirements, he may find that the impairments result in limitations that functionally equal the listings[6]. 20 CFR § 416.926a. To establish functional equivalence in step 3, the claimant must have a medically determinable impairment that results in marked limitations in two functional domains or an extreme limitation in one domain. 20 CFR § 416.926a(a). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 CFR 416.926a.

**C.  <u>Discussion</u>**

### 1. ALJ's Decision

In this action, the ALJ issued an unfavorable decision on September 16, 2009.  The ALJ determined that while J.R. has the

---

[6] In making this assessment, the reports of the State Agency medical consultants, reports of other treating, examining and non-examining medical sources, and the claimant's symptoms, including pain and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, are all taken into consideration. 20 C.F.R. §§ 416.927, 416.929; and SSR 96-5, 96-6p and 96-7p.

severe impairments of attention deficit hyperactivity disorder and SP Epilepsy, they do not meet, medically equal or functionally equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P. (Tr. 15). The ALJ also found that J.R. has "less than marked" limitations in his ability to acquire and use information, attend and complete tasks, care for himself, and health and physical well-being, and that he does not have any limitations in interacting and relating with others, or moving about and manipulating objects. (Tr. 19-25). Accordingly, the ALJ concluded that because J.R. does not have an impairment or combination of impairments that result in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, he is not disabled under the Act. (Tr. 23-24).

### 2. Record Evidence

#### Academic Evidence

The academic records reflect that during all times relevant, J.R. was attending John Will Elementary School. (Id. at 139-239). The record shows that J.R. was administered the Kaufman Assessment Battery for Children, Second Edition ("KABC II") on April 13, 2007. He received scores of 91 on Sequential Index; 66 on Simultaneous Index; 92 on Learning Index; 99 on Planning Index; and 81 on Knowledge Index. J.R. obtained an

overall score of 81 on Fluid Crystallized Index, which falls in the below average range. (Id. at 144-153).

J.R. was also administered the Wechsler Individual Achievement Test II ("WIAT II"), and received the following scores: 80 Spelling; 57 Written Expression; and 63 Written Composite. The record reflects that J.R. was also administered other tests, including the Behavior Assessment System for Children (BASC-2), which is used to evaluate the behavior of children and young adults.  Overall, J.R. was rated in the at risk range on the Behavior Symptoms Index, which includes hyperactivity, aggression, depression, atypicality, withdrawal and attention problems. (Id at 149-152).

The school records reflect that IEP meetings were conducted in April/May 2007 to determine if J.R. was eligible for the program based on concerns regarding his written expression and attention span. (Id. at 154-157).  It was noted that J.R. was currently passing all of his subjects, that he has been diagnosed with ADHD, that he was receiving treatment at the LeMoyne Center, and that his teachers reported that there are no behavior or attention problems when he is taking his medication on a regular basis.  The IEP Plan Team determined, on May 8, 2007, that J.R. qualified for special education services under Alabama State Department of Education guidelines for the 2007-2008 school year, during which he would be in third grade. (Id.

at 154, 156, 159-180, 207). A strategy was developed to address J.R.'s inattention. It was decided that J.R. would receive third grade instruction in the general education classroom with accommodations, and that regular grades would be earned. (Id. at 207). The accommodations would include seating J.R. away from doors and windows and near the teacher, providing J.R. breaks when restless, breaking J.R.'s assignments into shorter segments, and providing J.R. with positive reinforcement for appropriate on-task behavior and work completion. (Id. at 206-219).[7]

During an IEP Team meeting in September 2008, J.R.'s resource teacher, Mr. Oglesby, reported that J.R. needed help in reading and needed a reading goal. J.R.'s classroom teacher, Ms. Brubeck, also reported that J.R. had problems with reading and attention. (Id. at 221). It was decided that J.R.'s IEP plan would be changed so that for the 2008-2009 school year, J.R. would receive a "basic" grade for math, reading and language arts, and would receive a regular grade for science and social studies. (Id. at 221-222). J.R.'s goal for the school term was

---

[7] Included in the record is an unsigned and undated "Child Disability Evaluation for School Age Children (Age 6 to Attainment of Age 12)," which appears to have been faxed on January 30, 2008. In it, the author opines that J.R. has "marked" limitations in acquiring and using information and in attending and completing tasks. (Id. at 139-40).

that he would be able to use a wide range of comprehension strategies to comprehend literary/recreational material with 80% accuracy and that he would be able to decode multisyllable words on a fourth grade level with 80% accuracy. (Id.)

In an undated "student narrative," Mr. Oglesby, J.R.'s special education teacher, reported that he had worked with J.R. since August 15, 2008, and that he and J.R.'s classroom teacher, Ms. Brubeck, agree that he should be seated with few distractions. He also noted that J.R. began to pout each time something did not go his way, that J.R.'s homework and assessments began to deteriorate, and that J.R. began to cry uncontrollably whenever he was reprimanded. (Tr. 226).

Likewise, Ms. Brubeck, J.R.'s classroom teacher, reported that J.R. had been her student since August 2008, and that his maturity level was "well below" his classmates. She also noted that he continues to suck his thumb, that he is very easily upset and cries frequently, and that he goes into "strange moods" where he shouts or makes animal noises. She noted that math is J.R.'s strength and that he typically does better in math than many of the other children in the class. (Id. at 226-27).

In an IEP student profile covering February 2009 to February 2010, it was noted that J.R. had shown growth based on his classroom scores, Star test, and the Brigance Diagnostic

Test for comprehension; however, his reading score for the second quarter was one point less than the first quarter. The profile listed J.R.'s strengths as: vocabulary knowledge and comprehending functional and textual information, although he has difficulty with comprehending literary/recreational materials, identifying important details in textual/informational materials, and decoding unfamiliar and multisyllabic words. The profile also noted that J.R. is easily distracted in the classroom, that his mother reported that he gets easily frustrated at home when not on medication, and that his behavior causes learning difficulties. The profile reflects that steps were taken to reduce distractions and that his IEP was modified to include accommodations in general education requirements. Also, J.R. would receive a regular grade in all areas except reading, where a basic grade would be given. (Id. at 229-234). Additionally, the profile notes that J.R. is "a very friendly person and well liked by his peers" and that when given free time, " he likes to read." (Id. at 228).

## Medical Evidence

The relevant medical evidence of record shows that Plaintiff was seen by Norma Mobley, M.D. (hereinafter "Dr. Mobley") on two occasions for a health maintenance exam. During the July 9, 2007 visit, Plaintiff reported that J.R. has a learning disability in reading comprehension and writing but he

12

is "doing better" academically. Dr. Mobley noted that at age nine, J.R. was still sucking his thumb. (Id. at 254-56)[8]. J.R.'s examination was normal, and was diagnosed with ADD with hyperactivity; asthma, stable; eczema, atopic dermatitis; and learning problems. (Id.) J.R. was next seen by Dr. Mobley on February 21, 2008. (Id. at 240-46). Dr. Mobley's treatment notes reflect that Plaintiff reported that J.R. was having difficulty at home and school and seemed to have developed a tolerance to his medication, Daytrana 15 mg patch[9]. According to Plaintiff, J.R. could not sit still, was constantly talking and disrupting his classroom, was having angry outbursts and yelling at other children and adults, was hitting and kicking his sibling when angry, and was angered by small things. The physical, neurological and psychiatric exams are listed as normal, and Dr. Mobley assessed J.R. with attention deficit disorder of childhood with hyperactivity, allergic rhinitis, behavior problems, and conduct disorder, childhood onset type. Dr. Mobley suggested behavior therapy, and referred J.R. to Dr. David Roberts for counseling. She also increased J.R.'s dosage of

---

[8] Dr. Mobley's records incorrectly refer to J.R. as female.

[9] Daytrana is a central nervous system stimulant that is used to treat ADHD. It affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. See www.drugs.com/daytrana.html (last visited Mar. 30, 2012).

Daytrana to 20 mg for one month and directed him to continue treatment at the LeMoyne Center. (Id.)

The record contains treatment notes from the Mobile Mental Health Center ("MMHC") LeMoyne Center/ Alta Pointe from April 2004 through at least June 2009. (Tr. 257-96, 304-12, 384-414, 423-38). J.R. was seen at the LeMoyne Center for outpatient individual, group, and family therapy. Psychological records for the year 2004 reveal a history of hyperactivity, sleeplessness, talking back to adults, school disruption, fidgeting, crying spells, temper tantrums, and inattentiveness. Plaintiff reported that she had to "stay on him to finish work" and that he appeared to be "in space" at times. (Id. at 257-67).

Psychological records reflect that during a visit to LeMoyne on January 19, 2006, Plaintiff reported that J.R. was doing better in school but not at home. At that time he was taking Ritalin[10], and the dosage was increased. (Id. at 291). In much of 2006, it was noted that J.R. was inattentive, defiant, oppositional, fidgety, distractible, argumentative with his sister, had memory lapses and low self-esteem, and earned a "D" in reading at school. It was further noted that J.R. had not

---

[10] Ritalin is a central nervous system stimulant that is used to treat ADD and ADHD. It affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. See www.drugs.com/ritalin.html (last visited Mar. 30, 2012).

been taking his medications. (Id. at 284-290). Treatment notes dated October 30, 2006, reflect that J.R. has difficulty swallowing pills, so his medication was changed to a Daytrana patch in November 2006. (Id. at 284-285).

The treatment notes for January and February 2007 reflect that J.R. was struggling with reading, impulsivity, and was "in trouble all the time." Plaintiff admitted to inconsistent management due to her own depression. She also reported that J.R. could not tolerate the 20 mg Daytrana patch because it caused appetite loss. His dosage was decreased to 15 mg, and his mother was encouraged to obtain special education testing and educational services through the school in order to address J.R.'s learning problems. (Id. at 282-3, 312). The therapy notes dated March 20, 2007 reflect that J.R. reported that he "fe[lt] good about himself," that he made the "Hall of Fame," and that his grades were improving. The therapist noted that Plaintiff reported that J.R. finished more homework, was less easily frustrated, and needed less supervision since the Daytrana Patch was changed to 15 mg. Plaintiff also reported that J.R. completed chores with less supervision, had less conflicts with his sister and no physical aggression, and she attributed the improvement to the change in medication dosage. (Id. at 278-9, 281).

The treatment notes for April and May 2007 reflect that J.R.'s was earning "A," "B," and "C" grades, that he was promoted to the third grade, and that his attention and hyperactivity had improved per his mom and his teacher. Plaintiff also reported that J.R. continues to have anger problems at home. (Id. at 276-7, 280).

The treatment records for the latter part of 2007 reflects that J.R. was now receiving special education services and tutoring assistance. J.R. reported that he liked school, that he received good grades in all subjects except math, and that he was received tutoring in math. His mother reported some improvement in his concentration and behavior at times. (Id. at 273-5). Treatment notes reflect that in J.R.'s mid-quarter progress report, his teacher indicated that he was having trouble with sitting down, completing work without frequent prompts, holding his pencil, eating lunch, and relating to other children. (Id. at 270-1). On December 21, 2007, Plaintiff called to report that J.R. was experiencing angry outbursts, including hitting and threats, and that afterwards, he did not appear to be aware of his behavior. (Id. at 268). The Center notes reflect that J.R. participated in group therapy in December 2007 and January 2008.

During a February 2008 counsel session, J.R. reported that his medication helps him. The therapist noted that J.R. was

cooperative and appeared to listen but needed to be occasionally redirected to the assigned art project. (Id. at 306). The April through October 2008 records reflect that J.R. continued to be compliant with his medication. No negative academic reports or defiant behavior at school were noted, although, Plaintiff reported that J.R. continued to talk back to her. J.R.'s mood, sleep, and appetite were noted as stabilized. (Id. at 385-391).

Treatment notes from December 11, 2008 reflect that Plaintiff called in and reported that J.R. was more oppositional, defiant, irritable, and disruptive at the after-school program, and that he had been more irritable and easily angered at home, so Plaintiff stopped giving him his antidepressant and resumed the Daytrana 30 mg patch. According to Plaintiff, she saw some improvement after the switch. (Id. at 414). Plaintiff was advised that at that point, J.R. was only being treated for depression, and not ADHD, and that he could be re-evaluated for ADHD medications. J.R. was prescribed Clonidine[11], and Plaintiff was instructed about the benefits of the medication. The notes also reflect that J.R.'s grades had improved since the beginning of the school year, and that

---

[11] Clonidine is often used to treat ADHD and works by decreasing your heart rate and relaxing the blood vessels so that blood can flow more easily through the body. See www.ncbi.nlm.nih.gov (last visited Mar. 30, 2012).

assistance from the resource teachers was helping. J.R. reported feeling happy when his grades improve, and when questioned about his behavior, he became tearful, and indicated that he has nothing fun to do before or after school. (Id. at 412-3).

Treatment notes dated January 9, 2009 reflect that J.R. was not taking his medication because he was having difficulty swallowing pills. Additionally, notes from January 14, 2009, indicate that J.R. had been seizure free for the year. Later in the month, J.R. exhibited inappropriate behavior, which Plaintiff felt was due to a change in his medications. (Id. at 404-8).

The therapist noted, on January 30, 2009, that J.R. had no grades less than a "B" and that his work/study skills had improved. She also noted that narratives from J.R.'s teachers indicated he was having "much more difficulty with attention-concentration" and that he had had some "very good" days. According to the notes, Plaintiff associated J.R.'s behavior problems with the Daytrana patch, and she reported that she had increased his dosage to two patches a day. Plaintiff was later informed that two patches could have lethal side effects. Plaintiff reported that the two patches were discontinued, and that no side effects were observed. (Tr. 403-405)

In March 2009, J.R.'s therapist noted that his academic performance continued to improve and that he usually completed

homework, although he might need one-on-one attention from his special education teacher. During that day's therapy session, the therapist assisted him with anger management skills. (Id. at 395-6). The May 2009 treatment notes reflect that before J.R. began the Daytrana 15 mg patch, his grades were "Ds" and "Es," but that after using the patch, he earned two "A" and three "C" grades. Plaintiff also reported that J.R. was sleeping well, reading more, and behaving at home and school. (Id. at 435).

William H. Simpson, Ph.D. (hereinafter "Dr. Simpson"), completed a Childhood Disability Evaluation on February 8, 2008, at the request of the Agency. Dr. Simpson determined that J.R.'s impairment or combination of impairments were severe but did not meet, medically equal, or functionally equal the listings. Dr. Simpson also opined that J.R. has "less than marked" limitations in acquiring and using information and attending and completing tasks, and no limitations in interacting and relating with others, moving about and manipulating objects, caring for oneself, and in health and physical well-being. In opining that J.R. has "less than marked" limitations in the domain of acquiring and using information, Dr. Simpson noted that the records indicate that J.R. was passing all of his subjects and that he does better in school if seated by his teacher and away from distractions. With respect to the domain of attending and completing tasks, Dr. Simpson noted that the records reflect

that while J.R. does not finish things he starts and does not complete his homework, his IEP teacher reported he had no behavior problems when taking his medications on a regular basis.  Additionally, in finding that J.R. has no limitations in the domain of interacting and relating to others, Dr. Simpson noted that J.R.'s activities of daily living indicate that he has friends his own age, that he can make friends and get along with his teachers, although his mother reports that he does not get along with her or other adults. (Id. at 297-302).

Plaintiff was treated by Dr. Ilyas A. Shaikh at Gulf Neurology from March 2008 through at least July 2009. (Tr. 313-22, 379-83, 415-22, 439-48). Dr. Shaikh diagnosed J.R. with SP Epilepsy.  During J.R.'s May 19, 2008 visit, Dr. Shaikh noted he was still having staring spells and problems with attention and restlessness. An MRI and other testing were normal. (Id. at 315-7, 319). The treatment notes dated April 21, 2008, July 1, 2008, October 28, 2008, January 20, 2009, and June 9, 2009, reflect J.R. was doing well on his medications, which included Zoloft[12] and Clonidine. (Id. at 313-4, 317-8, 379, 382, 419-20, 443-8).

3.   **Analysis**

---

[12]  Zoloft is used to treat depression and works by increasing the amounts of serotonin, a natural substance in the brain that helps maintain mental balance.  See www.ncbi.nlm.nih.gov (last visited Mar. 30, 2012).

Plaintiff argues that the ALJ committed reversible error by failing to discuss the weight, if any, given to the opinions of two of J.R.'s teachers. According to Plaintiff, the ALJ failed to mention the narrative letters from Mr. Oglesby and Ms. Brubeck. Plaintiff argues that these letters do not describe a child who has no limitations in interacting and relating with the others, and these letters should have been considered in evaluating J.R. in the domains of acquiring and using information, attending and completing tasks, and interacting and relating to others. (Doc. 13). Plaintiff also argues that SSR 09-2p, 2009 SSR LEXIS 2 require the ALJ to weigh the opinions of J.R.'s teachers when assessing his limitations. (Doc. 13 at 5).

In his opposition, the Commissioner acknowledges that under the regulations, the observations of teachers, as "other sources," are important when evaluating the severity of a child's impairments. The Commissioner argues, however, that Ms. Brubeck and Mr. Oglesby's narratives do not offer opinions about J.R.'s functional abilities; thus, they are not acceptable non-medical "opinions." Additionally, the Commissioner argues that even if the ALJ should have discussed the teacher narratives, any error was harmless because the ALJ specifically stated he considered all of the evidence in the record, and the ALJ is not required to discuss every piece of evidence. (Doc. 14).

Based upon a careful review of the record, the undersigned finds that the ALJ's failure to discuss the narrative letters provided by Mr. Oglesby and Ms. Brubeck was not error. Rather, the ALJ's decision reveals that he carefully considered all the relevant evidence, and his decision that J.R. is not disabled is supported by substantial evidence.

Plaintiff is correct that, teachers, as well as other non-medical personnel who are able to observe and interact with a child on a daily basis, are valuable resources in determining the severity of a child's impairment and how a child typically functions compared to other children his age. 20 C.F.R. § 416.913(d) (These sources may provide evidence "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work or, if [the claimant is] a child, how [the claimant] typically function compared to children [the claimant's] age who do not have impairments.").

SSR 06-03p, 2006 SSR LEXIS 5 advises that the opinions of "other sources" such as school teachers and counselors, who have had extended contact with a claimant in their professional capacity, may outweigh the opinions of treating or examining medical sources, if their opinions are supported by other record evidence and if the source sufficiently explains the opinion. See SSR 06-03p, 2006 SSR LEXIS 5, *11 (The factors outlined in 20 C.F.R. § 416.927(d) "represent basic principles that apply to

22

the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources,' such as teachers and school counselors, who have seen the individual in their professional capacity"); SSR 09-2p, 2009 SSR LEXIS 2; Reed ex rel. DMR v. Astrue, 2009 U.S. Dist. LEXIS 99357, *7-8 (S.D. Ala. Oct. 26, 2009) (observing that in evaluating non-medical sources, the evaluation is fact-specific and should consider the nature and extent of the relationship between the source and claimant, the source's qualifications and expertise, the extent to which the source provides relevant evidence in support of the opinion, and the consistency of the opinion with other evidence).

Although the ALJ is required to consider these "other source" opinions, non-medical testimony can neither establish the existence of a medically determinable impairment, nor establish disability absent corroborating competent medical evidence. See SSR 06-03p, 2006 SSR LEXIS 5, at *5 ("Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead there must be evidence from an 'acceptable medical source' for this purpose."); 20 C.F.R. § 416.927, 416.926a(e); Meredith v. Astrue, 2011 U.S. Dist. LEXIS 37363 (E.D. Wash. Apr. 5, 2011); cf. Madise v. Astrue, 2009 U.S. Dist. LEXIS 87623 (S.D. Ala. Sept. 23, 2009).

In this case, the ALJ concluded that J.R. does not have an impairment or combination of impairments that meet or functionally equals the Listings. The ALJ's decision contains a detailed summary of J.R.'s progression through school, including a specific discussion of his grades and efforts by the school to address J.R.'s behavior and learning difficulties.  The decision also discusses in significant detail the medical evidence from Alta Pointe/LeMoyne, which contains extensive information concerning J.R.'s performance at school, as well as the medical findings of Dr. Shaikh. Further, the ALJ referenced the hearing testimony of both Plaintiff and J.R., and noted that Plaintiff testified that J.R.'s grades were improving and that his medication and his placement in the IEP program have helped to improve J.R.'s problems at school. (Doc. 12 at 23).

It is clear from a reading of the ALJ's opinion that he adequately considered all of the evidence, including educational records. Indeed, the ALJ explicitly stated that he considered all of the relevant evidence, including "objective medical evidence and other relevant evidence from medical sources; information from other sources, such as **school teachers**, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in **all settings** (i.e.,

at home, **at school**, and in the community)" as required by 20
C.F.R. § 416.924a(a) and SSR 09-2p. (Doc. 12 at 15) (emphasis
added). In addition, the ALJ noted he considered the "whole
child" and "assessed the interactive and cumulative effects of
all of the claimant's medically determinable impairment(s),
including any impairments that are not 'severe' in all of the
affected domains." (Id. at 15-16).   In regards to the opinion
evidence, the ALJ stated he "considered the opinion evidence in
accordance with 20 C.F.R. 2416.927 and SSRs 96-2p, 96-5p, 96-6p,
and 06-3p", and a review of his decision supports this assertion
(Id.) Accordingly, the undersigned finds no reason, and
Plaintiff has provided none, to discount the ALJ's assertion
that he considered the opinion evidence, which includes the
teacher narratives, in rendering his decision.  As noted by the
Commissioner, an ALJ is not required to "specifically refer to
every piece of evidence in his decision," so long as the
decision is sufficient to allow this Court to conclude that the
ALJ considered the claimant's medical condition as a whole. Dyer
v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam).
Thus, Plaintiff's contention that the ALJ committed reversible
error because he did not specifically reference the teacher
narratives is without merit.

Also without merit is Plaintiff's suggestion that the ALJ's
findings regarding J.R's limitations in the domains of acquiring

and using information, in attending and completing tasks, and interacting and relating with others deserves further consideration. Substantial evidence supports the ALJ's decision that J.R. does not have a "marked" limitation in more than two domains, or an "extreme" limitation in one domain. The record reflects that William H. Simpson, Ph.D. reviewed J.R.'s records and concluded that J.R. has "less than marked" limitations in acquiring and using information and attending and completing tasks, and no limitations in the other domains. (Id. at 181-96, 303). Also, in finding that J.R. has a "less than marked" limitation in acquiring and using information and in attending and completing tasks, the ALJ discussed both J.R.'s school records and medical records and noted that J.R. has been diagnosed with Hyperactivity-Impulsivity-Attention Syndrome and attention deficit disorder, that he has struggled with attention-concentration and reading comprehension, and that he has had behavior issues. The ALJ also found that once an IEP was established and J.R. began receiving accommodations at school, and his medication was regulated, J.R.'s grades improved, and his mother testified that the IEP was helping and that J.R. completes his classroom work and homework as long as he is on his medication. Accordingly, the undersigned finds that while J.R. clearly has limitations in these two domains, the evidence reflecting J.R.'s positive response to IEP intervention and his

current medication provides substantial evidence in support of the ALJ's finding that J.R.'s limitations in these domains are "less than marked."

With respect to the domain of interacting and relating to others, the ALJ found that J.R. has no limitation in interacting and relating with others and noted that the therapy notes from the LeMoyne Center dated June 24, 2009 reflect that J.R. had been doing well at school, that he followed directions, was polite to others and was respectful to the staff members and his peers. A review of the record evidence reveals that J.R. has had some behavior problems, particularly with respect to following instructions at school and at home; however, the records demonstrate that he has no behavior or attention problems when he is taking his medication on a regular basis. Indeed, the record is replete with statements from J.R.'s teachers, therapists, treating physician, and mother tracing his ADHD behavioral problems to irregular dosage or adjustments of his medications and noting that he performed better when taking his medication regularly. Accordingly, the undersigned finds that while there is evidence which strongly suggests that J.R. has "less than marked" limitations in the domain of interacting and relating with others, the ALJ's finding that J.R. does not have any limitation in this area is harmless error as the substantial record evidence supports the ALJ's ultimate findings

that J.R. does not have "marked" limitations in at least two domains, or an "extreme" limitation in one domain. The ALJ's opinion is consistent with standardized testing results, school records, medical opinions, and other observations by J.R.'s teachers and mother. Accordingly, viewing the record in its entirety, the undersigned is satisfied that the ALJ's decision finding that J.R. is not disabled is supported by substantial evidence.

**V.    Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income, be **AFFIRMED.**

**DONE** this **30**th day of **March, 2012.**


                              **/s/ SONJA F. BIVINS**
                         **UNITED STATES MAGISTRATE JUDGE**